# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| INTERNATIONAL WASTE INDUSTRIES CORPORATION, <br> Plaintiff, <br><br> v. <br><br> CAPE ENVIRONMENTAL MANAGEMENT, INC. <br> Defendant. | \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* | Civil Action No. 12-cv-03596-AW |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OPINION

Pending before the Court is Defendant Cape Environmental Management, Inc.'s Motion for Summary Judgment. Doc. No. 30. The Court has reviewed the motion papers and exhibits and concludes that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2011). For the reasons discussed below, Defendant's Motion will be GRANTED.[1]

## I.    BACKGROUND

The following facts are taken from the motion papers and exhibits and are not disputed, unless otherwise noted.

### A.    The Bidding Phase

On or about August 1, 2009, the Air Force Center for Engineering and the Environment ("AFCEE") requested proposals for the construction of a solid waste management facility at Camp Bastion, Afghanistan. The project was referred to as Task Order 10 ("TO10"). The proposals were requested under the Heavy Engineering Repair & Construction indefinite

---

[1] Also pending are the parties' Motions to Seal their briefs and attached exhibits. Doc. Nos. 31, 40, and 43. These unopposed motions will be GRANTED pursuant to Local Rules 104.13 and 105.11.

quantity / indefinite duration ("HERC IDIQ") contract.[2]  The AFCEE required responses to its

requests for proposals ("RFP") by August 31, 2009.

On August 21, 2009, Defendant Cape Environmental Management Inc. ("CAPE"),

preparing a bid on the TO10 project, issued a request for quotes ("RFQ") to potential

subcontractors for the fabrication of incinerators to be installed at the waste management

complex.  The RFQ was sent to at least six subcontractors, including Plaintiff International

Waste Industries Corporation ("IWI").  The RFQ provided that lower-tiered subcontractors could

not be used unless they were expressly identified on the Quotation Form supplied by CAPE.  The

Quotation Form required bidders to list subcontractors or suppliers providing over $500,000.00

in supplies or services.

On August 26, 2009, IWI submitted its original bid proposal to CAPE in the amount of

$4,180,250.00 for two 24-ton/day capacity incinerators.  IWI's bid materials represented that it

was a full service organization and manufacturer.  IWI did not disclose, however, that it intended

to use subcontractors for the manufacture of the incinerators.  At the time of the original bid

proposal, IWI had not determined what, if any, subcontractors it would use to assist in the

fabrication of the incinerators, and asserts that no such subcontract would exceed $500,000.00 in

value.  The parties dispute whether IWI's initial representations regarding manufacture and the

use of subcontractors were accurate.

Following IWI's August 26, 2009 submission, CAPE engaged in a series of

communications to obtain more details on IWI's bid proposal.  For example, on August 30,

2009, CAPE informed IWI that its layout and footprint information and systems description

contained insufficient detail.  CAPE also e-mailed IWI on August 31, 2009 to request price

---

[2] An IDIQ is a federal government contract which provides for an indefinite quantity of supplies or services for the
duration of the contract term.  During the IDIQ term, contractors that have been awarded the IDIQ have the
opportunity to bid on distinct task orders.

information for certain incinerator parts, a list of spare parts, and additional specifications of incinerator and generator capacities.  IWI submitted revised bid proposals on August 27, 2009 (Revision A) and again on August 31, 2009 (Revision B) to supply more information.[3]  Contrary to CAPE's assertions, IWI maintains that its initial bid proposals were sufficiently detailed and compliant with CAPE's RFQ.

On August 31, 2009, CAPE submitted a bid proposal to the AFCEE for the construction of the solid waste management complex.  CAPE's August 31 proposal incorporated IWI's Revision B bid proposal, and no other subcontractors' proposals were included in CAPE's bid.  CAPE's total bid amount to the AFCEE was $14,070,660.00.

In early September 2009, CAPE and other prime contractors were notified by the AFCEE that the prices quoted on TO10 exceeded the AFCEE's budget for the project.  The AFCEE reduced the capacity of the requested incinerators from 24 tons/day to 12 tons/day and clarified other changes to the scope of the work.  On September 9, 2009, CAPE contacted IWI regarding the price reduction and requested another quote in light of the reduced capacity requested by the AFCEE.  CAPE requested a response from IWI by the following morning.  CAPE sent similar correspondence to other potential subcontractors as well.  In response, HiTemp Technology Corporation ("HiTemp") submitted a revised bid dated September 10, 2009, in the amount of $1,070,000.00 for the reduced capacity incinerators.

On September 22, 2009, the AFCEE contacted CAPE and other HERC IDIQ contractors to allow each prime contractor an opportunity to revise their initial proposals as a result of the reduction in incineration capacity and other changes to the project.  On September 24, 2009, IWI accounted for the reduction in incineration capacity and submitted another revised bid proposal

_____

[3] IWI submitted another revised bid proposal on or about September 14, 2009 (Revision C), which provided additional specifications regarding the 24 ton/day capacity incinerators.

(Revision D) to CAPE in the amount of $1,020,785.00. Relying upon and using IWI's Revision D bid proposal, on September 24, 2009, CAPE submitted to the AFCEE its Final Proposed Revisions ("FPR") for the TO10 project in the amount of $8,369,905.00.

      B.      <u>The Award of the Prime Contract to CAPE and Subsequent Negotiations between IWI and CAPE</u>

The AFCEE awarded the TO10 prime contract to CAPE on or about September 30, 2009. Once CAPE was awarded the contract, it held a kick-off meeting in which it began setting up meetings with potential subcontractors and suppliers and assigning duties to meet the requirements of the contract, which included engineering submittal deadlines of October 15, 2009. On October 2, 2009, CAPE sent IWI an agenda with a variety of critical items not provided in IWI's bid proposals, including a foundation plan, shipping information, a schedule of deliveries, systems capacities and descriptions, control panel details, a vertical preliminary design drawing, and water and electrical requirements. CAPE requested that IWI's submittals be provided by October 6 or October 7. According to CAPE, the only item that was timely submitted by IWI was a "basic" layout of a drawing view of the proposed Incinerator. IWI contends, however, that it timely complied with CAPE's request for submittals when it provided what it describes as a "detailed" system layout.

Also on October 2, 2009, CAPE transmitted a document to IWI titled "Limited Notice to Proceed" (hereinafter, the "NTP"). The NTP reads as follows:

> This letter will serve as the formal notification that CAPE Inc. intends to award a subcontract agreement to [IWI] to perform the work in accordance with our client's requirement. This document will serve as authorization to [IWI] to provide support of this effort in accordance with the terms as specified herein. The effective date of this Limited Notice to Proceed is October 2, 2009.
>
> Prior to a definitized subcontract execution, [IWI] is authorized to make expenditures up to $25,000.00 to provide CAPE Inc. the foundation plans,

engineering submittals, shipping list of equipment including weights, dimensions and value in preparation and support of Delivery Order 010. These amounts may be increased based upon mutual agreement of the parties, prior to execution of a final subcontract document.

The cost limitations as specified herein can be changed only by mutual agreement of the parties and execution of a formal modification to this Notice to Proceed. [IWI] agrees to promptly begin preparing the foundation plans, engineering submittals, shipping list of equipment including weights, dimensions and value with completion as requested by [James Stewart, CAPE's Vice President of International Construction and Logistics] and within 10 weeks from the date of this Notice to Proceed.

[IWI] shall indicate acceptance of this Notice to Proceed by signing and returning one copy of this document to CAPE, Inc. not later than October 3, 2009 12:00 p.m. CDT. Upon acceptance of both parties, the subcontractor shall proceed with performance of the work specifically authorized.

Doc. No. 30 Ex. R. IWI never executed or expressly accepted the terms of the NTP. Instead, on October 8, 2009, IWI e-mailed CAPE and stated, "[p]lease note that the project starting date would be from the date we receive an acceptable Cape's [sic] contract to IWI and the advance payment." Doc. No. 30 Ex. S, at CAPE00598. IWI's President and owner Mehran Etemad avers that IWI was uncomfortable signing the NTP without consulting its attorneys because it was concerned about giving CAPE intellectual property rights in IWI's design drawings prior to the execution of a final contract. Etemad further testified during his deposition that the NTP was not executed because he was out of the state and was unable to review it with his attorney.

On October 9, 2009, CAPE sent a draft Purchase Order ("PO") to IWI along with several attachments. The draft PO was sent via e-mail from Michael Mooney, CAPE's senior contract negotiator, to Etemad. The PO incorporated by reference (1) IWI's Revision D bid proposal; (2) an Irrevocable Letter of Credit ("ILOC") required by IWI pursuant to language in its Revision D bid proposal; and (3) CAPE's Terms and Conditions. The attached Terms and Conditions contained provisions regarding intellectual property rights, warranty, termination, delivery, and

limitations of liability, among other items. It also included an integration clause, which provided, "[t]his PO and any documents referred to on the face hereof constitute the entire agreement between the parties and no prior or additional or conflicting terms and conditions, including but not limited to trade customs or verbal or written statements including any e-mails shall apply." Doc. No. 30 Ex. V, ¶ 21.[4]

During the subsequent two weeks, the parties engaged in negotiations regarding the PO and the Terms and Conditions. On October 15, 2009, Mooney e-mailed Etemad and stated, "[t]he PO must be signed today. Any other edits to the Terms and Conditions after we sign the PO is acceptable." Doc. No. 41 Ex. V. The PO was signed by both parties the same day. Although the PO document was signed on October 15, CAPE and IWI continued to negotiate the Terms and Conditions. On October 19, 2009, Etemad sent Mooney redlined edits and comments to the Terms and Conditions. Two days later, on October 21, Mooney sent Etemad four separate e-mails with additional edits and comments on the Terms and Conditions. The edits and comments concerned patent infringement and intellectual property rights, warranty, termination, delivery terms incorporating the ILOC, indemnification, and flow down provisions from CAPE's contract with the government. Etemad testified that the parties were "very close" or "extremely close" to finalizing the Terms and Conditions as of October 21, 2009.

With respect to the Irrevocable Letter of Credit, it was the intention of the parties for CAPE to deposit an agreed-upon amount in the bank that IWI could draw upon for payments based upon certain triggers and milestones for performance. All of IWI's bid proposals required CAPE to arrange for an ILOC "confirmed by U.S. Bank for 100% of the price valid for the duration of the project and to be paid as follow [sic]: 15% advance payment, 15% upon approval

---

[4] It appears that the Terms and Conditions and PO would incorporate by reference IWI's subsequent Revision E bid proposal, which was submitted on or about October 15, 2009. Revision E continued to reference the Irrevocable Letter of Credit and updated its bid amount to $1,039,175.00 for the packing of shipping containers.

of submitted drawings, 70% upon presentation of shipping document." *E.g.*, Doc. No. 30 Ex. N. Although the parties intended that CAPE was to issue the ILOC, no such ILOC was ever issued.

      C.      <u>The Breakdown in the Relationship between IWI and CAPE</u>

During the bidding phase and prior to the negotiations regarding the PO and Terms and Conditions in October 2009, CAPE had developed concerns regarding IWI's financial responsibility. James Stewart of CAPE testified that IWI failed to provide evidence of financial responsibility during the bidding process, including DUNS number, tax ID number, and other financial and credit information. When asked why evidence of financial responsibility was important, Stewart explained:

> When in this case the volume of the agreement – in terms of volume I mean dollar amount – is significant, most importantly – and so we needed to evaluate their financial capabilities and their relationship with their suppliers or subcontractors that were going to support them. Because the delivery to the government was critical, without this information it was not possible for us to do a true analysis to ensure that we were going to be compliant with a request from the government that was very sensitive to the success of the operations in the Afghanistan effort, the military operations.

Doc. No. 30 Ex. A, Stewart Dep. at 248:12-249:2. CAPE's project manager Krishna Nalavala was also concerned about IWI's failure to accept the terms of the Notice to Proceed.

On or about October 9, 2009, CAPE obtained a Dun and Bradstreet ("D&B") Report on IWI's financial condition. The Report was largely inconclusive, as D&B was unable to provide a credit rating for IWI and the Report recommended that further inquiry should be made before reaching a decision. The D&B Report further indicated that the highest total credit it could recommend for IWI was $150.00. CAPE sought to visit IWI's manufacturing site to alleviate its concerns regarding IWI's ability to finance the project and manufacture and supply the product in a timely manner.

On October 11 and October 14, 2009, Les Flynn from CAPE e-mailed Etemad in attempts to schedule a visit to IWI's manufacturing facility. Nalavala again e-mailed Etemad on October 16, 2009, reiterating CAPE's desire to visit the facility. On or about October 20, 2009, Etemad first mentioned to Nalavala that IWI did not manufacture the incinerators. Concerned by this disclosure, Nalavala e-mailed Etemad on October 20 requesting the name and address of the company at which the incinerators would be manufactured. Etemad responded on October 22, 2009 and identified R.J. Florig of Conshohocken, Pennsylvania as the manufacturer. Etemad also wrote, "[p]lease note that all related matters about manufacturing must be directed to IWI as Florig is not aware of our projects unless we inform them by releasing the manufacturing drawings for a given project. So far they are not aware of your project." Doc. No. 30 Ex. GG. The parties discussed the possibility of a site visit at Florig's manufacturing facility in Pennsylvania or, alternatively, at a site containing a running incinerator in Maryland, but no site visit ever occurred. That same day, October 22, James McInerney of IWI contacted Florig for quotes on fabrication work for the incinerators it sought to supply CAPE.

Around this time, CAPE began discussions with another subcontractor, Consutech Systems LLC ("Consutech"), for the manufacture and supply of incinerators for the TO10 project. CAPE, through its joint venture partner, was initially contacted by Consutech on October 20, 2009. Following initial conversations, on October 21, 2009, Consutech submitted a detailed proposal and specifications for the manufacture of the required incinerators and a total bid price of $969,000.00. The following day, October 22, 2009, CAPE and Consutech executed a Limited Notice to Proceed. CAPE conducted a site visit of Consutech's facility on October 23, 2009. The same day, Consutech delivered submittal drawings for the project.

On October 23, 2009, CAPE cancelled the Purchase Order with IWI by sending the following correspondence:

> This letter serves as Cape's notice to International Waste Industries that we are immediately cancelling the subject PO 4461 for the Cape Inc. project located at Camp Bastion Afghanistan.
>
> We are cancelling the order because IWI cancelled the visit that CAPE considered necessary to vet your company and because we have not received any suggestions on approaches to reduce the schedule that would enable CAPE to finalize the [ILOC] and because we expected you to be able to accept our terms and conditions by now. Time is of the essence and you have not demonstrated this objective. Therefore we will not establish the [ILOC] nor advance any funds to IWI. We are forced to pursue alternative suppliers.

Doc. No. 30 Ex. HH. It does not appear to be disputed that until the PO was cancelled, CAPE had not informed IWI of any "red flags" or financial concerns it had with IWI.

CAPE and Consutech thereafter discussed the terms of an agreement and ultimately signed a fully executed Purchase Order, with Terms and Conditions, on or about November 12, 2009. Consutech ultimately delivered on the proposal and performed to CAPE's satisfaction.

IWI filed suit against CAPE in the Circuit Court for Montgomery County, Maryland on October 11, 2012. CAPE removed the action to this Court on December 7, 2012. IWI's Complaint alleges seven causes of action against CAPE: (I) Breach of Contract; (II) Quantum Meruit; (III) Detrimental Reliance; (IV) Unjust Enrichment; (V) Intentional Misrepresentation; (VI) Misappropriation of Trade Secrets; and (VII) Misappropriation of Products. CAPE has moved for summary judgment on all seven counts. In its Response in opposition to CAPE's Motion, IWI withdrew Counts VI and VII from its Complaint. Accordingly, judgment will be granted on those counts. IWI opposes CAPE's Motion with respect to Counts I-V. CAPE's Motion is fully briefed and ripe for the Court's consideration.

## II.    STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A disputed fact presents a genuine issue "if, after reviewing the record as a whole . . . a reasonable jury could return a verdict for [the non-moving party]."  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).  Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his favor, a nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Furthermore, a nonmoving party cannot defeat summary judgment with merely a scintilla of evidence.  *See American Arms Int'l v. Herbert*, 563 F.3d 78, 82 (4th Cir. 2009).

## III.    ANALYSIS

### A.    Breach of Contract (Count I)

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation."

*Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Maryland law recognizes the basic contract principle that "there must exist an offer by one party and an unconditional acceptance of that precise offer by the other, prior to withdrawal by the offeror, before a binding agreement is born." *Lemlich v. Bd. of Trs. of Harford Cmty. Coll.*, 385 A.2d 1185, 1189 (Md. 1978). Similarly, it is fundamental that "where there is a conditional acceptance or a counteroffer a contract is not made." *L & L Corp. v. Ammendale Normal Inst.*, 236 A.2d 734, 736 (Md. 1968). "It is essential that the minds of the parties be in agreement on material terms in order for a contract to be established." *Tecart Indus., Inc. v. Nat'l Graphics, Inc.*, 198 F. Supp. 2d 719, 724 (D. Md. 2004) (citing *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986)). No binding contract exists where the agreement "is so vague and indefinite that it is not possible to collect from it the full intention of the parties." *Marmott*, 807 F.2d at 1183.

In this case, IWI has failed to raise a genuine issue of material fact that the parties entered a binding agreement. As a preliminary matter, to the extent IWI claims that a binding agreement with CAPE was formed during the bidding phase in August and September 2009, that argument is without merit. It is well-established that the bidding process that occurs between a prime contractor and a subcontractor in relation to a public contract does not create a contractual relationship between the prime contractor and the bidding subcontractor. *See, e.g.*, *Premier Elec. Constr. Co. v. Miller-Davis Co.*, 422 F.2d 1132, 1135 (7th Cir. 1970). "Acceptance of a subcontractor's bid generally occurs only when a written contract specifically setting out the terms of the agreement is entered into by the general contractor and the subcontractor." *Id.* That a general contractor uses a subcontractor's bid in preparing its own bid on the prime contract— just as CAPE used IWI's bid in preparing its own bid to the AFCEE—does not constitute acceptance of the subcontractor's offer. *See, e.g.*, *id.*; *Merritt-Chapman & Scott Corp. v.*

*Gunderson Bros. Eng'g Corp.*, 305 F.2d 659, 662-63 (9th Cir. 1962); *Williams v. Favret*, 161 F.2d 822, 823-24 (5th Cir. 1947).

IWI has also failed to raise a genuine issue of material fact that the parties entered a binding agreement following the award of the prime contract to CAPE. As of October 23, 2009—the date on which CAPE notified IWI that it was cancelling the Purchase Order—several material terms were still the subject of negotiation between the parties. *See* Doc. No. 30 Ex. HH. On October 19 and 21, the parties exchanged multiple e-mails and redlined drafts of the Terms and Conditions, which reveal that there was no agreement on a number of material terms, including patent infringement and intellectual property rights, warranty and termination provisions, indemnification, and flow down provisions from CAPE's contract with the AFCEE. *See, e.g.*, Doc. No. 30 Exs. W, X, Y, Z, AA.

Any claims by IWI that these terms were not material are contradicted by the record. For example, IWI's President and owner avers that the company did not sign the Notice to Proceed sent by CAPE on October 2, 2009 in part due to IWI's concerns about giving CAPE intellectual property rights in the design drawings IWI was required to submit. Doc. No. 41 Ex. B, ¶¶ 18-19. That precise concern is reflected in one of IWI's proposed edits to a draft of the Terms and Conditions on October 19. Doc. No. 30 Ex. W, at CAPE00652.[5] Another material term subject to negotiation as of October 23, 2009 was a delivery provision, a draft of which stated, in redlined text, that "[t]he achievement of milestones to enable payment including the final inspection and acceptance payment shall be in accordance with the terms of the Irrevocable Letter of Credit." *E.g.*, Doc. No. 30 Ex. AA. There was never a meeting of the minds on this material term concerning payment to IWI; indeed, no ILOC was ever issued. *See, e.g.*, *SS&LC*

---

[5] Specifically, IWI's proposed language provided, "All manufacturing drawings, design drawings, engineering know-how and IWI system technology shall be and remain the exclusive intellectual property of IWI." Doc. No. 30 Ex. W, at CAPE00652.

*Grp., Inc. v. Ryland Grp., Inc.*, No. HAR 95-2168, 1996 WL 250029, at *3-4 (D. Md. Feb. 23, 1996) (finding no binding contract where there was no mutual assent on material terms, including receipt of a proposed letter of credit, and where continual redrafting evidenced the importance of the terms being negotiated). It is also not disputed that the parties were negotiating the language of the warranty provision, yet another material term of the unfinished agreement. *See, e.g.*, *Coating Eng'r Ltd. v. Electric Motor Repair Co.*, 73 F.3d 356 (Table), 1995 WL 764233, at *2-3 (4th Cir. Dec. 28, 1995) (unpublished) (finding no binding contract existed where the parties failed to agree on several material terms, including warranty provisions).

That the parties were "extremely close" or "very close" to finalizing the Terms and Conditions as of October 23, 2009 does not warrant a conclusion that a binding agreement was reached. *See* Doc. No. 30 Ex. H, Etemad Dep. at 102:17-21, 103:10-13, 104:17-20. As the Fourth Circuit explained:

> It is axiomatic that a party can hardly be bound to reach the intended goal of negotiations simply by the act of negotiating. Indeed, continual redrafting of a document indicates the importance of the terms being negotiated and the parties' intention not to be bound until final execution of the written agreement. Parties engage in negotiations not because they intend that the process itself will constitute the agreement, but because they desire and intend an eventual writing that will set forth the final terms satisfactory to both sides in every respect.

*Estrin v. Natural Answers, Inc.*, 103 F. App'x 702, 704 (4th Cir. 2004) (quoting *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. P'ship*, 734 F. Supp. 1181, 1189 (D. Md. 1990)). Indeed, the fact that IWI and CAPE engaged in continual redrafting and negotiation demonstrates that no binding agreement was reached.

IWI emphasizes the fact that both parties signed the Purchase Order on October 15, 2009, which it claims created an enforceable contract as of that date.[6]  However, the signatures on the PO document do not have the effect claimed by IWI.  Regardless of any signatures on that document, it is clear from IWI's own communications that further negotiations were necessary before a binding, comprehensive contract existed.  For example, after receiving the Notice to Proceed from CAPE on October 2, 2009, IWI did not accept its terms, but rather told CAPE, "[p]lease note that the project starting date would be from the date we receive an acceptable Cape's [sic] contract to IWI and the advance payment."  Doc. No. 30 Ex. S, at CAPE00598.  At that time, IWI expressly contemplated the preparation and execution of a *finalized* agreement, in addition to advance payment—presumably pursuant to the ILOC.  However, as discussed above, no ILOC was ever issued, no advance payment was ever made, and the Terms and Conditions were never finalized.  In these circumstances, the fact that the parties signed the PO document on October 15 did not create the existence of a binding contract.  *See, e.g.*, *Tecart*, 198 F. Supp. 2d at 726 ("There is a strong presumption against finding a binding agreement when the parties expressly contemplated the future preparation of and the execution of a formal contract document."); *see also Waterfall Farm Sys., Inc. v. Craig*, 914 F. Supp. 1213, 1221-24 (D. Md. 1995) (holding that signed Letter of Agreement was no more than a non-binding letter of intent because the parties intended that several additional documents would have to be agreed upon and executed before a binding and enforceable contact existed and because there were extensive subsequent negotiations over undecided material terms); *Phoenix*, 734 F. Supp. at 1186-89 (holding that signed letter of intent and negotiations did not create binding agreement because the parties clearly intended that a comprehensive agreement would have to be executed).

---

[6] IWI appears to argue that CAPE is attempting to reform or rescind the contract that was allegedly entered on October 15, and cites multiple cases dealing with reformation and rescission.  *See* Doc. No. 41-1 at 13-16.  Most of these cited cases are inapposite, as the central dispute in this litigation is whether a contract existed.

IWI also emphasizes the language of the October 15, 2009 e-mail from CAPE's senior contract negotiator Michael Mooney to IWI's President requesting IWI's signature on the PO document. The language employed by Mooney does not alter the Court's analysis. Specifically, Mooney wrote, "[t]he PO must be signed today. Any other edits to the Terms and Conditions after we sign the PO is acceptable." Doc. No. 41 Ex. V. The Court reads the latter statement as a suggestion that further negotiations would be necessary with respect to the Terms and Conditions, not as acknowledgment that a comprehensive agreement was in effect upon execution of the PO. Mooney's statement therefore did not constitute an offer capable of being converted into a binding, comprehensive agreement merely upon the parties' execution of the PO. *See USEMCO, Inc. v. Marbro Co., Inc.*, 483 A.2d 88, 93 (Md. Ct. Spec. App. 1984) (where purchase order specifically provided that sale "would be subject to terms and conditions to be disclosed later, the proposal was not capable of being converted into a contract of sale by an acceptance"). Regardless of Mooney's intentions or the language used in the e-mail, however, it is clear from the surrounding circumstances that several material terms remained in dispute, that the Terms and Conditions were never finalized, and that no ILOC ever issued. Accordingly, no binding agreement was entered. *See ABT Assocs., Inc. v. JHPIEGO Corp.*, 9 F. App'x 172, 176-77 (4th Cir. 2001) (quoting *Peoples Drug Stores, Inc. v. Fenton Realty Corp.*, 62 A.2d 273, 275 (Md. 1948)) ("[T]he terms of . . . a contract must be 'in all respects definitely understood and agreed upon.'").

IWI also appears to assert that the parties' actions prior to and following the signing of the PO created a binding contract or demonstrated the existence of a binding contract. To the contrary, most of the actions taken by the parties demonstrate that no comprehensive agreement had been reached. As noted above, IWI indicated in an October 8 correspondence to CAPE that

it would not start the project until it received the contract and an advance payment.  Doc. No. 30 Ex. S, at CAPE00598.  Around the same time, CAPE was concerned about IWI's financial condition and ability to perform, obtained an inconclusive Dun and Bradstreet Report on its financial condition, and began attempts to schedule a visit of IWI's manufacturing site in light of D&B's inconclusive report and IWI's incomplete financial history.  Doc. No. 42 Ex. B; Doc. No. 30 Ex. DD; Doc. No. 30 Ex. A, Stewart Dep. at 248:12-249:2, 271:1-273:10.  The parties engaged in a series of communications regarding the proposed site visit between October 11 and October 22, but no site visit was ever held.  Doc. No. 30 Exs. EE, FF; Doc. No. 41 Ex. A, Etemad Dep. at 118:1-122:7; Doc. No. 41 Ex. II, Nalavala Dep. at 77:4-85:13, 90:15-95:20.  Several of these communications indicated CAPE's perspective that a site visit was a *precursor* to any contractual agreement.  *See, e.g.*, Doc. No. 42 Ex. B (noting that "[b]ased on the D&B report, we should visit," and that a site visit "[w]ould give us a further level of comfort that they can deliver the equipment").  Accordingly, there is no factual evidence supporting a conclusion that the proposed site visit was an aspect of either party's performance or otherwise demonstrated the existence of a binding agreement.  Furthermore, the fact that IWI contacted its own subcontractor Florig for quotes on October 22 is not indicative of the existence of a binding agreement between IWI and CAPE.

Accordingly, IWI has failed to present a triable issue as to whether the parties entered a binding agreement.  Summary judgment on IWI's breach of contract claim is therefore appropriate.

B.    Quantum Meruit (Count II) and Unjust Enrichment (Count IV)

"Unjust enrichment and quantum meruit, both 'quasi-contract' causes of action, are remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness

dictates that the plaintiff receive compensation for services provided." *Dunnaville v. McCormick & Co., Inc.*, 21 F. Supp. 2d 527, 535 (D. Md. 1998). For IWI to establish a quantum meruit claim, it must establish: (1) that it rendered valuable services to CAPE; (2) that IWI intended to receive compensation for those services; and (3) that the services were rendered under such circumstances that reasonably notified CAPE that IWI, in providing the services, intended to be compensated. *See, e.g.*, *Alternatives Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 843 A.2d 252, 295 (Md. Ct. Spec. App. 2004). To maintain a claim for unjust enrichment, IWI must establish: (1) that it conferred a benefit upon CAPE; (2) that CAPE knew of or appreciated the benefit; and (3) that CAPE's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow CAPE to retain the benefit without the paying of value in return. *See, e.g.*, *Benson v. State of Maryland*, 887 A.2d 525, 547 (Md. 2005); *Smith v. Alacrity Servs., LLC*, 778 F. Supp. 2d 606, 610 (D. Md. 2011). Because IWI has failed to make the necessary showing to maintain either cause of action, summary judgment will be granted on Counts II and IV.[7]

IWI's quantum meruit and unjust enrichment claims are largely premised on its argument that CAPE received a benefit (the prime contract on the TO10 project) as a result of IWI's subcontract bid, which CAPE used in its bid on the prime contract. Doc. No. 41-1 at 18-19; Doc. No. 2, Compl. ¶¶ 27, 44-48. Presented with a similar set of facts, the district court for the District of South Carolina rejected virtually identical arguments set forth by the plaintiff in *Trident Construction Co. v. The Austin Co.*, 272 F. Supp. 2d 566 (D.S.C. 2003). In *Trident*, the

---

[7] Maryland law distinguishes between these two quasi-contractual theories of recovery, as "one [is] based on an implied-in-fact contract (usually designated as quantum meruit) and the other [is] based on an implied-in-law contract (usually designated as unjust enrichment)." *Sanders v. Mueller*, 133 F. App'x 37, 42 n.3 (4th Cir. 2005) (citing *Mogavero v. Silverstein*, 790 A.2d 43, 53 (Md. Ct. Spec. App. 2002)). One of the primary distinctions between the claims is the measure of damages: whereas unjust enrichment is measured by the gain bestowed upon the defendant, quantum meruit is measured by the reasonable value of the work performed by the plaintiff. *Mogavero*, 790 A.2d at 52-53. Any distinctions between the causes of action are inconsequential to the Court's analysis in this case, however.

general contractor and defendant Austin Company sought to bid on a design and construction project in which the Navy had solicited proposals. *Id.* at 569. Austin, plaintiff and subcontractor Trident, and a third party supplier entered an alleged teaming agreement to pursue the prime contract. *Id.* at 569-70. Austin, which used Trident's proposal in supplying its own price estimate to the Navy, was awarded the prime contract. *Id.* at 570. Austin did not seek a cost estimate from anyone else before submitting its bid to the Navy. *Id.* After being awarded the prime contract, Austin continued negotiations with Trident and sent it a proposed written contract. *Id.* It also began soliciting other bids for the work. *Id.* After receiving several other bids, Austin ultimately signed a subcontract with a different company. *Id.*

Trident sued Austin on multiple theories, including unjust enrichment, claiming that Austin obtained a benefit (the prime contract) as a result of Trident's bid. Applying South Carolina law, the Court rejected Trident's argument, the same one presented by IWI in this case, and granted Austin's motion for summary judgment on the unjust enrichment claim:

> [W]hen a subcontractor submits a proposal to a general contractor, the general contractor is not unjustly enriched when it does not award the subcontract to that subcontractor even though . . . the general contractor may have benefitted from the subcontractor's bid. Trident admits that it is a common practice for general contractors to use the price submitted by a subcontractor when establishing the general contractor's bid. . . . In such cases, general contractors are not liable for reimbursing prospective subcontractors with whom it elects not to contract. Similarly, Austin used Trident's bid in making its proposal to the Navy. Equity does not require that Austin repay Trident for this benefit because it chose to use another subcontractor. This is not a situation where Austin has retained a benefit bestowed upon it by Trident that makes it unjust for it to retain the benefit without paying for its value.

*Id.* at 578. The Fourth Circuit affirmed the district court's ruling in its entirety. 93 F. App'x 509, 510-11 (4th Cir. 2004) ("[I]t is not unjust for a general contractor to use a subcontractor's bid in obtaining a contract and yet eventually award the subcontract to another subcontractor.").

Courts from multiple jurisdictions have taken the same approach as the *Trident* court in

dismissing unjust enrichment and quantum meruit claims based on a general contractor's use of a

subcontractor's bid in making a general bid. *See, e.g.*, *Andersons, Inc. v. Consol, Inc.*, 185 F.

Supp. 2d 833, 837-38 (N.D. Ohio 2001) (Ohio law); *Clark Trucking of Hope Mills, Inc. v. Lee

Paving Co.*, 426 S.E.2d 288, 289-91 (N.C. Ct. App. 1993) (North Carolina law); *W.F. Holt Co. v.

A & E Elec. Co., Inc.*, 665 S.W.2d 722, 736-39 (Tenn. Ct. App. 1983) (Tennessee law); *Milone

& Tucci, Inc. v. Bona Fide Builders, Inc.*, 301 P.2d 759, 760-63 (Wash. 1953) (Washington law).

The Court concludes that the same result is dictated by Maryland law.

 IWI does not dispute that CAPE engaged in a competitive subcontract bidding process

with respect to the TO10 project, as it solicited bids from at least six companies, including IWI.

Doc. No. 30 Ex. A, Stewart Dep. at 99:9-100:4. When the AFCEE notified CAPE that its budget

had changed and the specifications for the incinerators would also have to change, CAPE

communicated these changes to multiple bidding subcontractors, not just IWI. *See, e.g.*, *id.* at

133:20-134:22; Doc. No. 30 Ex. M, at CAPE01344. IWI argues that its submission of multiple

revised bids transformed its contractor-subcontractor relationship with CAPE to one "closer akin

to that of partners." Doc. No. 41-1 at 19. However, IWI cites no legal authority, and the Court is

aware of none, that supports this vague proposition.[8] Furthermore, it is commonplace in the

industry for general contractors to use potential subcontractors' estimates in formulating their

own bids. *See, e.g.*, *Trident*, 272 F. Supp. 2d at 578; *Andersons*, 185 F. Supp. 2d at 838; *W.F.

Holt*, 665 S.W.2d at 737-38. Contrary to IWI's assertions, this was nothing extraordinary about

the relationship between CAPE and IWI during the bidding process, and certainly nothing that

would support recovery under a theory of quantum meruit or unjust enrichment under Maryland

---

[8] Indeed, as noted by the owner of Consutech, the company which ultimately received the subcontract from CAPE, revisions to bid proposals are commonplace in the industry. Doc. No. 30 Ex. RR, Lee Dep. at 33:14-34:14.

law.[9]  Accordingly, to the extent IWI bases its quantum meruit and unjust enrichment claims on CAPE's use of IWI's proposal in its bid for the TO10 prime contract, CAPE is entitled to summary judgment.

IWI also asserts that its quantum meruit and unjust enrichment actions are supported by the work it performed after CAPE had been awarded the prime contract.  First, IWI emphasizes that upon CAPE's October 2, 2009 request for engineering submittals, IWI timely provided a systems layout following the award of the TO10 contract.  Doc. No. 41 Ex. B, ¶ 12; *see also* Doc. No. 41 Ex. R; Doc. No. 41 Ex. A, Etemad Dep. at 81:8-10, 83:22-84:3; Doc. No. 30 Ex. A, Stewart Dep. at 158:13-17, 159:8-160:13.  The provision of the systems layout does not support IWI's quasi-contractual causes of action, however.  Given IWI's October 8, 2009 e-mail that the project would only begin upon receipt of the finalized agreement and advance payment, Doc. No. 30 Ex. S at CAPE00598, CAPE did not have reasonable notification that IWI intended to be compensated by CAPE merely for providing the systems layout.  Similarly, IWI has presented no evidence that its provision of the systems layout constituted a valuable service or conferred a benefit on CAPE, particularly because IWI's layout was never used in the TO10 project.  Moreover, nothing in the record suggests that it would be inequitable to deny IWI payment under the circumstances.

Second, IWI relies on the site visits that the parties attempted to schedule between October 11 and October 22.  No site visit ever occurred, however, and IWI has presented no evidence that it rendered valuable services or conferred a benefit on CAPE merely by communicating about potential site visits.  Additionally, given CAPE's perspective that a site

---

[9] The Court further notes that IWI has presented no evidence that its cost estimate was causally related to the AFCEE's award of the prime contract to CAPE.  Indeed, the price of the incinerators quoted by IWI in its Revision D bid proposal constituted approximately 12% of CAPE's total bid to the AFCEE.  *Compare* Doc. No. 30 Ex. N *with* Doc. No. 30 Ex. O.  Furthermore, the provision of incinerators was merely one of several criteria set forth in the AFCEE's bid evaluation checklist.  Doc. No. 30 Ex. K, at CAPE01229-01233.

visit was a precursor to a subcontract award, CAPE was not reasonably notified that IWI intended to be paid or that equity demands restitution for IWI. *See* Doc. No. 42 Ex. B.

Finally, IWI relies on its negotiations with subcontractor R.J. Florig for the fabrication of parts for the incinerator, which began on October 22, 2009. Doc. No. 41 Ex. JJ. It is not disputed, however, that Florig made no contribution to the TO10 project. But even accepting that IWI engaged in discussions with Florig for the benefit of CAPE or that its discussions with Florig somehow constituted a valuable service, CAPE did not even know that IWI used subcontractors until October 20, and did not know about the identify of R.J. Florig until October 22. Doc. No. 30 Ex. Q, Nalavala Dep. at 79:13-20; Doc. No. 30 Ex. GG. In these circumstances, CAPE was not on reasonable notice of IWI's efforts and could not have appreciated that any benefit was being conferred.

IWI has therefore failed to a present a genuine issue of material fact in support of its quantum meruit and unjust enrichment claims. Accordingly, summary judgment will be granted on Counts II and IV.

C.    Detrimental Reliance (Count III) and Intentional Misrepresentation (Count V)

To maintain an action for detrimental reliance under Maryland law, a plaintiff must establish the following elements:

> (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 (Md. 1996) (adopting test from Restatement (Second) of Contracts § 90(1) (1979)). In order to recover in an action for intentional misrepresentation, the plaintiff must establish:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 921 A.2d 245, 254 (Md. 2007) (citations omitted).

IWI maintains that CAPE promised the award of the subcontract to IWI and that IWI relied on CAPE's representations to its detriment by working on the project and foregoing other business opportunities.[10] CAPE is entitled to summary judgment on these claims because IWI has failed to raise a genuine issue of material fact in support of either cause of action.

With respect to the bidding phase, the record demonstrates that CAPE made no promise or false representation to IWI that it would be awarded the subcontract. As discussed above in the context of IWI's quantum meruit and unjust enrichment claims, it is not disputed that CAPE engaged in a competitive bidding process with multiple potential subcontractors prior to being awarded the TO10 contract. Indeed, CAPE's initial communication with potential subcontractors requested a "competitive quote," asserted that it was committed to "fair competition," and stated:

> If CAPE, Inc. is selected for the [TO10 project], CAPE, Inc. reserves the right to award to the offeror that, in CAPE's sole discretion, offers the best value . . . . Cape Inc. reserves the right to award without further discussion, to negotiate, to make single award, multiple awards, partial awards or no award at all.

Doc. No. 41 Ex. C, at CAPE00777-00778. This competitive, non-exclusive process continued even after the AFCEE notified CAPE of changes to its budget and the required specifications for the incinerators and requested follow-up bids. Indeed, IWI was not the only subcontractor to

---

[10] According to Etemad, "[f]rom the time CAPE informed IWI that it would receive the subcontract to CAPE's termination of the PO on October 23, 2009, IWI diligently worked toward the completion of the incinerator." Doc. No. 41 Ex. B, ¶ 14. IWI claims that its employees spent "approximately 520 hours throughout this project, from the bidding stage onwards." Doc. No. 41 Ex. W. IWI further alleges that it lost three job opportunities in Afghanistan as a result of its work with CAPE. *Id.*

submit revised bids during the process, as HiTemp submitted one on September 10, 2009. Doc.

No. 30 Ex. M. IWI's assertion that CAPE promised to award IWI the subcontract if CAPE was

successful in obtaining the TO10 prime contract finds no factual support in the record.[11]

IWI has also failed to sustain its claims for detrimental reliance or intentional

misrepresentation in the period after CAPE was awarded the TO10 project. Although CAPE

notified IWI that it *intended* to award the subcontract to IWI in its October 2, 2009 Notice to

Proceed, IWI declined to sign and return the NTP by the date indicated (October 3). *See* Doc.

No. 30 Ex. R. Rather than accept the terms of the NTP, IWI informed CAPE on October 8 that

the project would start on the date on which the contract and an advance payment was received.

Doc. No. 30 Ex. S, at CAPE00598. IWI never executed nor agreed to the terms of the NTP. The

NTP contained neither a clear and definite promise nor a false representation that IWI would be

awarded the subcontract, particularly given that IWI was required, and declined to, execute and

return the NTP. Furthermore, given IWI's non-acceptance of the NTP and the context in which

these discussions occurred, IWI cannot demonstrate that its action or forbearance following

receipt of the NTP—in particular, its provision of a systems layout in response to CAPE's

request for engineering submittals—was reasonable or that it had the right to rely on CAPE's

representations in the NTP.

Moreover, the fact that CAPE ultimately awarded the subcontract to Consutech rather

than IWI does not support IWI's claims. As discussed in detail herein, CAPE and IWI were

---

[11] IWI's President avers that "CAPE specifically stated that it would award the subcontract to IWI, if IWI assisted CAPE in securing the contract from AFCEE." Doc. No. 41 Ex. B, ¶ 8. Such self-serving, conclusory, and uncorroborated statements are insufficient to create a genuine issue of material fact that any promise or false representation was made by CAPE during the bidding phase. *See, e.g.*, *National Enters. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000) ("[Defendant's] self-serving affidavit . . . is not enough to defeat [plaintiff's] motion for summary judgment."); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory . . . or based on hearsay."); *CoStar Realty Info., Inc. v. Field*, 737 F. Supp. 2d 496, 510 (D. Md. 2010) (holding that hearsay statement and self-serving deposition testimony were insufficient to create a genuine issue of material fact to survive summary judgment).

engaged in negotiations from the time CAPE was awarded the TO10 project on October 2

through October 23, 2009, when CAPE sent notice to IWI that it was cancelling the Purchase

Order. During this period, CAPE developed concerns regarding the financial condition of IWI

and its ability to timely manufacture and supply the incinerators. *See, e.g.*, Doc. No. 30 Ex. A,

Stewart Dep. at 248:12-249:2, 271:1-273:10; Doc. No. 30 Ex. Q, Nalavala Dep. at 102:22-

104:13. CAPE was not contacted by Consutech until October 20, 2009, did not receive a bid

from Consutech until October 21, and did not execute a Limited Notice to Proceed with

Consutech until October 22. Doc. No. 30 Exs. JJ, KK, LL, MM. IWI cites no evidence in

support of its assertion that CAPE was "dragging IWI along" and "knew all along" that it would

not award the subcontract to IWI. *See* Doc. No. 41-1 at 23. Accordingly, IWI has raised no

genuine issue of material fact that CAPE made a clear or definite promise or false representation

following the award of the TO10 contract, or that IWI's reliance on CAPE's alleged promises or

misrepresentations was reasonable.[12] Summary judgment will therefore be granted on Counts III

and V.

## IV.     CONCLUSION

For the foregoing reasons, CAPE's Motion for Summary Judgment will be GRANTED.

A separate Order follows.

| | |
|---|---|
| __December 19, 2013__ | __/s/__ |
| Date | Alexander Williams, Jr. |
| | United States District Judge |

---

[12] Etemad's self-serving averments to the contrary, Doc. No. 41 Ex. B, ¶ 12, are insufficient to raise a genuine issue
of material fact. *See generally infra* note 11.